We'll hear argument this morning in Case 2603, Torres v. Texas Dept. of Public Safety. Mr. Tutte? Thank you, Mr. Chief Justice, and may it please the Court. The Constitution gave Congress the power to raise and support armies, and the reason for that grant was to ensure the survival of the nation. The Constitution provided Congress with the tools necessary to fulfill its preeminent national defense function, and the ability to authorize lawsuits, including suits against the states themselves, are among those vital tools. I'd like to make two additional points this morning. First, the war powers, including the Army and Navy clauses, are unique and fundamentally different from the Constitution's other grants of power. Unique textually, unique structurally, and unique historically. The states could not have read the Constitution, seen the federal structure it created, and believed they would retain sovereign authority to interfere with the federal government's preeminent national defense function. Second, USARA's protections are crucial in light of the structure of the modern military. At the turn of the 20th century, it became apparent the United States would be required to wage war on a global scale and at a moment's notice, and that this would require an immense fighting force. Rather than create a massive, peacetime-standing army, the United States instead created a reserve component, trained soldiers who would keep their civilian jobs, but would be ready to respond at a moment's notice to unpredictable global threats. To convince soldiers to join that force, and to ensure that soldiers in it would be willing to risk significant injury without hesitation, Congress promised these soldiers that they would not be discriminated against on the basis of their military service or service-connected injuries. USARA, and the cause of action that makes its rights real, is not a tangential or peripheral exercise of the war powers, but a core exercise of the United States' power to raise and support its army to fulfill its indispensable first task, protecting the national security. I welcome the Court's questions. Counsel, what do you do about our decision in Allen, which seemed to suggest that Katz, on which you rely, was quite specific and limited to that context? Your Honor, Allen does say that typically this is a limited, that sovereign immunity is limited, but as Allen pointed out, Allen is about abrogation, not a plan of the convention waiver. I would also point out that Allen acknowledged that... I don't quite understand the distinction that you're making between those two things. Could you explain that, why you think that these are in two separate buckets? The Court has explicitly treated them as separate buckets, Your Honor. In Tennise, the Court made clear that abrogation, the taking away of sovereign immunity, is something distinct from a waiver in the plan of the convention. I could speak more to that, but I think that it is a distinction in this Court's precedence and it's an important distinction. The 14th Amendment permits abrogation. None of the Article I powers have been found to permit abrogation, but the eminent domain power and the bankruptcy power have both been found to be plan of the convention waivers because the federal... Yes, Your Honor. Well, Mr. Tutte, both the eminent domain power and the bankruptcy power are inextricably intertwined, to use Tennise language, with judicial proceedings. I mean, the eminent domain power, there's evidence that the United States had delegated this power to private parties since the beginning, and the way to accomplish eminent domain is through a condemnation action. Similarly, with bankruptcy, bankruptcy proceedings are tied to litigation, and that is obviously not true of the war power. Litigation is not its central office. So why isn't that a distinction here? First I would say that I think eminent domain is not necessarily inextricably intertwined with judicial proceedings. I think in Tennise, the Court pointed out that eminent domain has long been exercised without condemnation actions, but simply by making a taking. But even accepting that it is... I relied pretty heavily on condemnation actions. Yes, Your Honor. So even accepting that those two powers have a unique relationship with judicial proceedings, that is not what actually motivated the decisions in those cases. I think the better way to think about those two cases and the war powers is that those powers are not complete unless, in a very ancillary way, suits against the states are authorized. So it's not... What do we do about the fact that, like the bankruptcy context, there's a long history? And here, by contrast, it appears that the first time Congress reported authorized suits against states was, I believe, 1974. Your Honor, we have suits that go back much further. We point to the category of suits that were thought to be contemplated by the Constitution itself for the peace treaty, the Treaty of Paris. We also have the suits against states that were authorized in 1833 in habeas corpus. Those were official capacity actions against state authorities. I understand habeas corpus, but this is a little bit different than habeas corpus, right? It is, Your Honor. So outside of habeas corpus and things like that, in 1974, is that about right? That's the first time that private damages actions were deemed by the political branches of the United States to be necessary to the effectual exercise of the war powers. Not exactly the most contemporaneous evidence of the original meaning of the Constitution and the Planet Convention, is it, Counsel? It is not, and we are not relying on that. What we're relying on is ultimately, primarily, the text and structure of the Constitution and the original understanding that the states must have had at the time that the Constitution was ratified. That is our primary submission. Well, can I put a little content on that? I mean, just complete the sentence for me. The war powers are different because what? The war powers are different because they are conferred unconditionally and without qualification. The states are divested, textually divested, of the power to interfere or engage in actions that are at variance with the war powers. So in Seminole Tribe, of course, which was the case that started all of this off, we dealt with the Indian Commerce Clause, and the Indian Commerce Clause is similarly an entirely federal power. It doesn't have the explicit divestment of the states, but it has everything else. And the Court was very clear about this. It said the Indian Commerce Clause represented, I'm going to quote some language here because I think it just applies perfectly to this case, a virtual total cessation of authority by the states, that relations with the Indian Tribes were the exclusive province of federal law, and that the Constitution had divested the states of virtually all authority over Indian Commerce and the Indian Tribes. And yet, we said, none of that mattered. So why should it matter here? Let me give you three reasons that it doesn't matter here. The first is that Seminole Tribe is an abrogation case. It was considering this in the context of, do these powers allow for the taking away of power in the same way as Bitzer? So it's not a plan of convention waiver case. I don't know. I mean, I asked you about this before, and I'm still trying to figure out the response a little bit. Maybe I'm just having a block here. But it seems to me that both are essentially asking the same question, which is that they're looking at the founding period and they're saying, what would the states have expected? And I don't really see the difference. Let me give you two more distinctions. One is that in Penn East, the Court made very clear that it was the exclusivity of eminent domain and the need for a complete eminent domain power in the federal sovereign that was what would have made the states understand that federal eminent domain permitted suits against the states. So this Court has decided cases whose reasoning is somewhat in tension with Seminole Tribes' reasoning about exclusivity. What's your third? My third is that Indian commerce is exclusive, but it's really exclusive with respect to the tribes. And something unusual was being done in Seminole Tribe, which it was trying to use the Indian commerce power to regulate the states, which is not the sense in which this Court has thought of that power as exclusive. And the Court has said that the United States has plenary authority to divest the tribes of any attributes of sovereignty. So when actually regulating the Indian tribes, exclusivity does permit suits against the tribes. I'm not sure I followed that answer, and maybe this is what Justice Kavanaugh was going to say and probably should be saying rather than me. I had understood the Indian commerce clause, and you can correct me if I'm wrong, to give Congress a lot of authority with respect to tribes in lieu of what normally might be local authority, state authority. So it does speak to state authority, but perhaps you have a different view. I'm just a little confused. The Congress could permit the states to actually exercise local control over the Indian tribes in a way that it would never authorize the states to participate in war making. So the exclusivity over the tribes themselves is really the exclusivity that the Court has been talking about versus interactions or intercourse with the states. Now it's true that Congress has exercised that power and taken the tribes into a trust relationship, but there is a textual divestment of any ability of the states to participate in war making in any similar way. They cannot... I guess I'm still stuck, and I'm not sure I understand that. Normally the states would have considerable authority over people within their geographic bounds. That is divested by the Constitution in large measure by the Indian commerce clause in the same way war making is. I think that's the parallel I see, and I'm struggling to see your distinction between the two. Your Honor, my distinction is that though the tribes exist within the states and though the power to regulate the tribes is granted in the Constitution, that exclusivity is not something that the federal government is required to exercise, and it's something that if the Congress had not exercised its power to regulate the tribes, I think it's unclear how the Constitution would have dealt with that. Congress did move into that domain and took full control, but if you think about it, it's granted in the same clause as the interstate commerce clause. It's granted in the same clause as the other powers that this Court has long held are concurrent. So that's all that I'm saying, and if you look at war powers, and you look at the very nature of the war powers, 50 separate sovereigns cannot participate in war making without... How important is the text of Article 1, Section 10, which explicitly divests the states of anything from the war powers? I think it's extremely important, Your Honor. I think that the textual divestment is powerful evidence that the states knew that they were giving up any power to interfere in this realm. The ultimate inquiry for the Court in this case is, did the states believe that they would retain a sovereign immunity that they could assert that would interfere with war making? But they gave up even more sovereign powers in Article 1, Section 10. They gave up the ability to conduct diplomacy. They gave up their ambassadors and foreign ministers. They gave up the very things that almost define sovereignty. But no one is saying that they would have the power to do any of those things now. There's no dispute that the states could not engage in diplomacy or exercise any kind of war making authority. The question is whether they relinquished their protection from private discrimination suits, which is a quite different thing. No one disputes that in this very case, the United States could come in and sue Texas and tell Texas that it had to reinstate Mr. Torres on terms consistent with USERRA. Let me give two answers to that question, and I appreciate the opportunity to. One is the political branches of the government determined that the best way to protect the rights that USERRA guarantees is to give those whose rights it protects the ability to protect them themselves. It did not want the executive branch to be able to exercise discretion. It did not want to require soldiers to go to a bureaucrat in Washington and persuade them that their case was worthwhile. My co-counsel, Mr. Lawler, has brought in one USERRA case where the Department of Labor has said there is no merit. And I think this was a wise decision. The Department of Labor keeps statistics. They submit a report to Congress. I encourage the court to look at this. In the last five years, they've brought nine USERRA suits, total, against any employer in the United States. They get about 1,000 complaints at the Department of Labor a year, and it's resulted in nine suits. So I think that Congress understood that, in fact, if you try to put this through the United States, it's not going to be effective. Is it your argument that the states can't assert sovereign immunity in any lawsuit that Congress authorizes under the war powers? Your Honor, I don't think the court has to reach that today, because I think in this case, it is central to raising and supporting armies. And the court need not go further than say that this is a proper exercise of the raise and support army clause. But I don't quite understand that answer. So you were emphasizing the exclusivity of the war power. But now you seem to say that there are some things that Congress could not do with respect to authorize a suit against the state under the war powers? No, Your Honor. And, in fact, I think in the entire history of the United States, no state has ever successfully asserted a sovereignty limitation on the war powers in any context. But what I am saying is that in this case... Let me give you an example. I think one of the things that Congress asserted when it established the interstate highway system was the need for those highways for defense purposes. So would that mean that Congress could authorize individuals to sue states for failing to maintain highways properly or failing to patrol them properly? Well, I think that if there was a limit, it would be a limitation on the war powers themselves. It would be an internal limitation, not a sovereign prerogative of the states to say that that was a limitation on the war powers. And that's ultimately what I'm saying. You're saying that the establishment of the interstate highway system couldn't be justified under the war powers? No, Your Honor, I'm not. I'm not saying that. But all I'm saying is that to the degree that that would be a boundary case or a difficult case, it would be because it's a difficult case of the ultimate scope or extent or tie of the war powers. I guess I'm confused. Why wouldn't that be heartland? Why aren't you defending that position? Well, Your Honor, I want to make clear that wherever you draw the line on the scope or extent of the war powers, the question in this case is whether if the states saw the Constitution, read its text, read the Federalist No. 23, read the Federalist No. 41, and I encourage reading the whole, reading those essays. I think you can safely assume this bench will and has read a lot of things about this case. And I think the question is, if it's essential to the war powers, if Congress, which apparently the United States hasn't made enough war, right, it's essential to the war powers that an individual be able to sue the state, in this case, for forms of discrimination, whatever. Why wouldn't it be equally essential to allow veterans to sue for making sure our highways are in good order so that we can deal with invasions on the West Coast? I mean, that was the whole point of the interstate highway system, I think Justice Alito's alluded to. Well, this court, and this goes back to Justice Alito's original question, in war powers cases, the court has typically said that the war powers are broad, authorized a great many things, but then limited the holding to the facts before the court. And I think it's done that in recognition of the potential breadth of the war powers. And so answering that hypothetical is just difficult, and we know it's difficult. And this case is a core exercise of the war powers, because recruitment and retention of soldiers, direct, it's directly related to the recruitment and retention of soldiers. But your answer has to be that if it's within the war powers, then yes, Congress could authorize suit. Is that correct? You're fighting whether Congress could rely on its war powers to interstate the West Coast?  Let's assume that it can. Then your answer is yes. Yes, Your Honor. I think that if any, I mean, our submission is any appropriate exercise of the war powers, emphasis on appropriate exercise. Yes or no? But if it's within... Yes or no? Yes, Your Honor. Okay. I'm sorry, just yes to, I've lost track of the question. Apologies. Yes to what? Yes, a proper exercise, it is a proper exercise of the war powers, or if it is a proper exercise of the war powers. But the yes is big. Yes, Your Honor. So you're not giving, yeah. Yes. Don't give away the if. No, the if is all in this particular situation. If it is necessary to raise and support armies to permit individuals to sue because otherwise they will hesitate to take a bullet on a battlefield because they don't know if they're going to have their job as a plumber's apprentice when they come home because their employer can fire them if they're injured. That is central because recruitment and retention of the armed forces, this court has held, even recently in Rumsfeld versus Fair, has held is a core exercise of the raise and support armies power. And so, and let me say, Texas does not dispute... I'm getting your argument to the raise and support armies power. I understood that to be the SG's position, but I thought your position was broader than just raise and support armies and Navy. Well, I, our position is that in view of what is at stake, which is the survival of the nation, the federal government's indispensable first task of protecting the national security, the war power is the proper unit of analysis. But... You're speaking beyond just the raise and support armies. Yes, your honor. Because, and this court, you know, in the Hamilton versus Kentucky Distillers case, the 1980 case about a prohibition on the sale of alcoholic beverages nationwide, Judge Learned Hand was the district judge, and he said that ultimately, whatever the source of authority in his district court opinion, whatever the source of authority is a rather barren question. The real question is, what are the limits? And that ultimately is what decides the case. Whether it's located in the power to declare war, or it's located in the additional text of raise and support armies, what is at stake is so vital and so unique and essential to the nation, that that ultimately is what's important. Counsel, I know you're relying, or I guess the government's relying on the Army Clause. You're relying on all of them. I take something from the Militia Clause, and I take what it views as raising and supporting and providing and maintaining a militia. It uses the words to provide for organizing, arming, and disciplining the militia. So if I take that that is just a specification of a part of what that power is, to raise and support an army, or to provide and maintain a navy. Disciplining seems to me as purely a federal right. I assume that retaliation for service is a form of discipline to the employee. And I assume that your argument is that it is by its nature a power that requires a waiver of a state's immunity because it's giving over absolute control in a way that the others are not. There's concurrent. Is that the basis of your argument? That in most of these, including commerce with Indians, we have concurrent state jurisdiction. We have none with respect to armies. Correct? Correct, Your Honor. Yes. The states do not participate in raising and supporting the army. That is an exclusively federal power. And they do not discipline the militia. The federal government disciplines the militia. And so that is absolutely part of our argument. I want to make clear, Texas does not dispute that the obligations of USERRA are a constitutional exercise of the war powers, including as to Texas. Texas does not dispute that the cause of action in USERRA is constitutional. And not just against all employers other than Texas, just as long as Texas consents. The only question that Texas raises is it says that if it wants to assert an implicit immunity, even when it interferes with war making and is acknowledged to interfere with the ability to raise and support an army, that it should have the power to do so and that the Constitution contemplated that. And our submission is the Constitution does not contemplate that. And that given the sovereign authorities that the states gave up textually, given the fundamental structure of the Constitution, they gave up the ability to assert sovereign immunity in that precise context when it would interfere with the ability of the federal government to wage war. Thank you. Oh, I apologize. No. I was just going to move us on to the next phase of questioning. And Justice Thomas, do you have anything to ask? Just a couple of questions. Mr. Chief Justice, thank you. Counsel, does it make a difference here that USERRA authorizes suits against Texas in its own courts? This court has said that whether it was in a state court or a federal court is not relevant for the analysis of whether there was a waiver in the plan of the convention. We don't think that it is relevant, although Texas getting its own judges is pretty good, we think. Why isn't that commandeering their court system? Your Honor, in Prince and other cases, the court has said that the states were contemplated to have been the court system of the United States and that creating federal courts was optional, and in which case all suits, in bankruptcy, in eminent domain, everything would have been ultimately vested in state courts, even though they would involve suits against states. I think some of the early states would have disagreed with that, but let's move on. You seem to put a lot of weight on the fact that Congress has, the national government has the war power that's unconditional and without qualification. I think those were your words. If that's the basis for such broad authority, why couldn't Congress do the exact same thing under another provision that is unconditional and without qualification, such as, for example, the coinage clause? Your Honor, I think what's important is that they're provided without qualification or condition, but the objects to which they are directed are fundamental incidents of international sovereignty, and so when you view them in view of their objects and subjects, you understand that the unconditional grant carries with it a much more significant grant of federal authority than with respect to the concurrent regulatory powers. Well, I think that's what you said. Then the question becomes is how close this connection must be. I think when we had Justice Barrett alluded to it, in the case of bankruptcy, I think we said that the court said that it was inextricably intertwined with judicial proceedings. This seems to be quite remote from being inextricably intertwined with war powers. Your Honor, I would say that the war powers have, since the founding, had an important relationship with the adjudication of controversies. The Constitution understands that soldiers will need to be tried and make special provision for that, and the war powers have been exercised in ways that are uniquely judicial, and we canvassed this in our briefing for over 200 years. Yes, but I would say that that's one thing, that as court-martial proceedings or proceedings involving military conduct, this is post-military. But let's move on. I don't want to delay matters. The final question I have for you is can you give me an example where sovereign immunity has been waived for private money damages suits against states? I think you're speaking about, for instance, in Katz, where it was a preferential transfer suit. Is that in the nature? No, just money damages. Aren't money damages involved here? Yes, Your Honor. Give me an example of a suit in which money damages, not just compensation for property, that sort of thing, but money damages. Your Honor, I would point to both suits by the United States against the state and suits by... Well, the United States doesn't really count, so that's conceded. Well, Your Honor, it is important because Texas says that it would be willing to entertain these suits, the exact same suits for the exact same damages that inure to the exact same beneficiary as long as this was captioned United States against Texas. And so, you know, if that's all that's at stake, it seems like a pretty low-stakes question for Texas. So, because these suits are authorized for money damages by the United States on behalf of the veteran. Thank you. Justice Breyer, any questions? Do you know in an eminent domain suit brought by an individual under delegation, if something valuable has been destroyed by the present owner, is that person who is suing for eminent domain entitled to money damages and compensation? Yes, Your Honor. And do you know any case which says they wouldn't get that as part of the eminent domain suit? I'm aware of no case, Your Honor. Justice Alito? Mr. Todd, way back when you were giving three reasons for why Seminole Tribe doesn't apply here, I think the second, and I don't want to mischaracterize you, it was a while ago, so tell me if I've gotten this wrong, but you basically said, you know, a lot has happened since Seminole Tribe, a lot of water under the dam, and we don't have to take some of And I'll just say, speaking personally now, I doubt I would have been in the majority in Seminole Tribe, so if you have reasons for why you think Seminole Tribe should not be read for all it's worth, you know, have at it. Well, Your Honor, I think the biggest reason is that it would be extraordinary for Seminole Tribe to have placed a limitation on the war powers without any discussion at all of the incidental impact of that. Well, I guess what I'm saying, I know that Seminole Tribe was not about the war powers, but Seminole Tribe seemed to take an extremely strong view that the exclusivity of a federal power really didn't matter, and I took you to be saying that our cases since Seminole Tribe have suggested that Seminole Tribe wasn't right. Is that what you're saying? I think that the reasoning of Penn East puts a focus on the exclusivity and the importance to the complete exercise of the eminent domain power in the federal government. I don't want to say that this Court has to overrule a single precedent to rule for us. The reasoning of Seminole Tribe is not the best for us, but it just does not reach beyond the ordinary domestic Article I powers. The Court could draw a distinction there and say that a complete but ordinary domestic regulatory power is different, fundamentally different, than an exclusive international incident of the sovereignty of the United States, and that that is a perfectly sound reason to overrule nothing in Seminole Tribe, but nonetheless reach the right result in this case. Justice Gorsuch? Justice Kavanaugh? On that last question, I'll say the same thing. Article I, Section 10 is important too, right? Yes, absolutely, Your Honor. I think it's essential, and its divestiture... There's no equivalent of that in the Indian Commerce Clause. There is not, and the development of the Indian Commerce Clause exclusivity jurisprudence followed a different trajectory. Here, it was written and enumerated in the Constitution itself. They could never exercise those powers. They cannot enter into a treaty, period. And then you mentioned earlier it came up in 1974. Why? And why is that relevant? Oh, yes. Yes, Your Honor. It came up because there was resistance among the states to re-employ the veteran in 1974, and the traditional respect that the federal government... Because? Because of opposition to the war at the time. And the states were basically using their privilege as states to express in law a view about what the foreign policy of the United States should be and how the United States should wage war, which I think is exemplary of the issue that we think that the war powers never could allow. The states do not have a role to play in this area. Justice Barrett? I do have a question. I want to take you back to Justice Kagan's question, too, about the buckets and how do we know what the difference is between the buckets. Do you think they just made the wrong argument in Seminole Tribe? You know, you've said a couple times, well, that was an abrogation case, that was an Article I case, and we're not talking about abrogation here. But why not? I mean, maybe we just didn't consider the argument in Seminole Tribe. I mean, you point out in your brief that, well, the national defense was one of the reasons that the Constitution was ratified. Well, so was commerce in trying to get rid of protectionism. And so I think we've said again and again in some of our commerce-caused cases, we've said it in Wayfair, that this is the kind of thing, free commerce between the states and giving Congress the commerce power was a reason. So do you think that we just, you know, that the right argument wasn't made and that Seminole Tribe should come out differently if we considered the plan of convention argument? I think that Seminole Tribe is correct and that you do not have to overrule anything. No, I understand you don't want to overrule it, but what if the plan of convention argument has been made? As the answer to Justice Kagan's bucket question, well, maybe we should be thinking of all of this as plan of the convention. And so maybe Seminole Tribe, they just made the wrong argument. Your Honor, I don't know. I have not read the briefs. I've read the relevant passages in Seminole Tribe many times to try to understand what was the reasoning of the case. And I just think that Seminole Tribe made some statements that were broader than its holding and made some assertions about it. No, no, no, just like back up. I'm not asking whether anyone actually made the plan of the convention argument in the case. I haven't gone back and looked at the briefs either, but I assume that they did not. I'm saying that if today you were presented with those facts, could you make a successful plan of the convention argument on the facts of Seminole Tribe for some of the reasons I gave? No, no, I do not believe that you could make a plan of the convention argument for the Commerce Clause. I think that the powers of commerce, of copyright, of intellectual property, of coining money, of counterfeiting securities, of postal roads, all of the domestic powers that are conferred in Article I, Section 8, sovereign immunity plays a fundamental role in preserving democratic accountability and the role of the states in our federal system. But here we have a different matter. Here we have the survival of the nation. And as to that, there's just a fundamental difference in how it was talked about at the time of the ratification. There's a fundamental difference in the history of how these powers have been exercised and understood by the states. There's just no, I think, no comparison. So thank you. Thank you, Counsel. Thank you, Your Honor. Mr. Michel. Thank you, Mr. Chief Justice, and may it please the Court. Raising and supporting military forces is among the United States' express constitutional powers and most essential responsibilities. USERRA directly advances that mission. Its employment protections originated with the World War II draft. They were extended to permit suits against states to combat discrimination against the military during the Vietnam War. And they are especially important today to Guard and Reserve Forces, who both serve the nation and work for employers, disproportionately including state employers. Those employers have sovereign immunity to most private suits. But this area is different. The Constitution was adopted in large part to stop states from undermining federal efforts to raise a military. This Court has never imposed a state sovereignty-based limitation on the federal powers to raise and support armies or provide and maintain a navy. In this distinctive area, we are one nation with one sovereign. And USERRA's cause of action can be fully enforced against all employers. Mr. Michel, the Court in Penn East drew an express distinction between abrogation of sovereign immunity and sovereignty that was waived, given away, under the plan of the Convention. What is the consequence of that, in your view, what is the consequence of that distinction? Or could you perhaps articulate, perhaps more clearly than the Court did in Penn East, exactly what that distinction is? So, Mr. Chief Justice, I'll do my best. I think those two inquiries go to different sources of evidence. When you're talking about a surrender of immunity in the plan of the Convention, the Court is looking at what the Founders understood, what the text of the Constitution provides. When you're asking about abrogation, the Court has looked to whether a particular statute provides for suits against states with particular clarity. And that's the 14th Amendment inquiry that the Court has undertaken. Now, I don't dispute too much with Justice Kagan's characterization earlier that there is some commonality in those analyses, but I think ultimately the plan of the Convention test looks to, as it sounds, the plan of the Convention. And in this case, there really is overwhelming evidence that the states understood they were giving up a fundamental aspect of their sovereignty with respect to this particular power to raise and support armies and provide and maintain a navy. I guess I would have thought that the abrogation cases are also, in part, not only about whether Congress has spoken clearly, but whether, even if Congress did speak clearly, its word would govern. Isn't that what they're about? And in order to answer that question, aren't we looking at the same kinds of things that we're looking at to determine whether there's an exception under the plan of the Convention? I mean, I do think you might be looking at a lot of the same sources. I think they're somewhat analytically separate, and the Court has described them as somewhat analytically separate, but I don't want to resist too much the notion that in both cases what the Court is analyzing is the constitutional power and its effect on the states, namely whether the states were relinquishing a fundamental attribute of sovereignty. And I do think there are some commonalities in the Court's abrogation and plan of the Convention cases that confirm that there is overlap in that area. Mr. Mischel, how do you answer the question that I asked Mr. Tutte about Penney and Katz's bankruptcy and eminent domain addressing power that was really uniquely tied to judicial proceedings? And I don't think anybody would dispute that in the plan of the Convention, states relinquish their war power, but war power isn't inextricably intertwined with condemnation actions or bankruptcy proceedings. I mean, it's separate from suit. How do you address that? Sure, a couple of ways, Justice Barrett. I agree with Mr. Tutte that although that is a common thread between Katz and Penney, it doesn't seem to be reflected all that strongly in the Court's reasoning, but even if you think it is reflected more strongly than that, it's certainly not in, for example, the Court's 14th Amendment cases where the Court has concluded in cases like Fitzpatrick v. Bitzer that there is an abrogation of sovereign immunity or that the 14th Amendment divested states of attributes of sovereignty, even though there could, of course, be suits under all kinds of different causes of action there that aren't inherently bound up in litigation. And I think you could say similar things about suits by the United States against states, suits by states against other states, which I take it everybody agrees under the older cases like United States v. Texas did give way to a surrender in the plan of the Convention. Why don't you bring these suits, Mr. Michel? So we do bring some suits. As we explained in our invitation brief, I think my friend for petitioner maybe undersells how vigorous the United States has been in this area. We actually resolve a lot of cases consensually where the Department of Labor, for example, will call the employer and explain their USERRA responsibilities and the cases can reach a successful conclusion for the service member in that way. But I don't dispute petitioner's point that the private enforcement remedy is very important here. It's Congress's judgment. This Court has said that Congress has broad judgment in the area of raising and supporting armies. This is a familiar enforcement mechanism. For example, Title VII authorizes private enforcement actions, and I think the Court has long recognized that Congress is entitled to include those kind of mechanisms. I guess there is a little bit of dissonance between the importance that you're saying this has to the federal war powers and, on the other hand, the actual practice of the federal government in prosecuting these suits. Well, I respectfully disagree, Justice Kagan. I think when the government has found violations, we've brought cases. And as I said, sometimes we haven't had to bring litigation, but I think that's the process working, not the process failing. There's an amicus brief that has statistics about the number of cases that the Justice Department has brought. It says that in the 16 years from 2004 to 2020, the Justice Department filed 109 lawsuits, which is a little more than six a year, and that only two were filed from 2015. Since 2015, only two have been filed. Are those statistics correct? I think they are correct, but as we pointed out in our invitation brief, the numbers are much larger when you look at how many soldiers' claims have been successfully resolved, and I respectfully submit that that's the more important number. I mean, if the government can resolve a claim without litigation, I think that's better for everyone, the soldier and the employer alike. What's the realistic problem that you foresee if you don't prevail in this case? Well, Justice Kavanaugh, I think it's the problem that led Congress to adopt the statute in the first place, and in particular to adopt the provision allowing suits against states, which is there could be serious problems of discrimination against the military. Happily, I don't think we face that problem on a systematic basis today the way that we did during the Vietnam War, but of course that could change, and a constitutional ruling by this court would take this tool off the table forever. I also think there are individual cases like this one where employers, you know, there's a good faith dispute about whether there was a violation in this case, but being able to bring these suits is an important remedy for the individuals, and it's an important deterrent effect for the employers, including state employers, to know that they have to comply with this statute or else they'll face real consequences. You said the state employers or state employees are disproportionately part of the Guard and Reserves. I think you said that. I did, yeah, and I don't have an exact figure on that, but I think that's not a particularly surprising fact. I mean, there's people who are drawn to public service, people who are like petitioner in the state police or, you know, state firefighting services. Not only are those people more likely to join the military, but they also bring a set of skills that's particularly important to the military. Has the federal government considered whether if Texas wins this lawsuit, the federal government would bring suit on Mr. Torres' behalf? So there's an administrative mechanism in the statute by which a plaintiff can ask the government to bring a suit, and Petitioner Torres didn't invoke that in this case. But if he were to invoke that, the federal government would consider it. We don't have a position on the merits of this case, but if that claim came to us or a similar claim came to us in a different case, we would consider that. But I do want to make the point that, you know, the federal government having to litigate cases all over the country would be a real departure from what Congress, in exercising these broad powers, determined was necessary to raise in support of military. And I think the court owes particular judgment to Congress's decisions in this area. In Federalist 32, Hamilton discusses this, and one of the things he says, the issue here is whether the convention in its plan was to maintain those, quote, rights of sovereignty which states had before, end quote. And he lists three criteria, which I'll ask questions about later. All right. But what are those rights of sovereignty? Are they just asserting sovereignty and immunity in a lawsuit by a private person? Or are there others? I think there are probably other. And what are the other? Do you have anything in your mind about those others? Well, I mean, of course, if you win or if you lose rather, whatever those others are, they're not infringed either. What I've been looking for is what are those others? Sure. I mean, I don't have a list in mind. Any one or two. You know, the immunity against commandeering, immunity against coercion. I think this court has said that other attributes of sovereignty like that come up in the doctrine. So if, in fact, California had been invaded in 1942, and as frequently happened in the Philippines, the army had to seize houses so they wouldn't fall into the hands of the Japanese. At that point, it couldn't be done. If you lose. Well, I don't want to accept that, Justice Breyer. I think. Well, is it a right of sovereignty or not? You said the commandeering, they're commandeering the sheriff's office. I shouldn't have said a house. I said they're they're commandeering the governor's palace. They're commandeering. All kinds of things happen in wars. So a couple of points. I think we would say if we lost this case that the government could still do that. The court in cases like case versus bowls has said that the 10th Amendment sovereignty power does not entitle a state to object to the government. Very well. Then you're saying that Hamilton, when he writes this, did not mean rights of sovereignty, which the state had before. He only meant some of the rights which the state had before. Well, my response, Justice Breyer, would be that he did mean, at least for this case, he meant sovereign immunity. And, of course, for this. But what I'm thinking, if I expose my thought, is that when you talk about the Indian Commerce Clause, you're talking about a power to regulate something that will exist no matter who wins, namely commerce. It's going to go on there and it will be regulated in many ways. And the same is true of a lot of these other clauses in the First Amendment. But here, it's quite different. Because I don't know what is involved when you say states retain their sovereign rights to raise armies, to raise navies, to, and then there were a list of six clauses. So I thought you might have thought that through better than me, and I suspect you have. I want to hear what you have to say. Well, I think the most important part of the Hamilton passage, and I hope this is at least partly responsive to your question, is that when you read that in conjunction with Hamilton's passage in Federalist 81, which this Court has relied on as the foundation of its sovereign immunity jurisprudence all the way back to Hans v. Louisiana, he directly links that list that you're talking about, Justice Breyer, in Federalist 32 with the areas in which there was an alienation of sovereignty to produce a waiver of sovereign immunity in the plan of the Convention. So if you take Hamilton's word on what sovereign immunity means, you have to read the whole paragraph. And he references back to this paragraph 32, and this is where Article I, Section 10, I think, is particularly important, because one of the categories on the list, which you didn't read but we're going to go on to read, is where a power is granted to the federal government on the one hand, and withheld from the states on the other hand. And that's exactly what's happening with the raise and support. Now, is it because if you read the six clauses that have to do with the war power in Article VIII, they give to Congress all these powers, armies, navies, etc., but it ends by giving to the states the power of running the militia in two areas, reserving, it says, to the states, respectively, the appointment of officers in the militia, and the authority of training the militia according to discipline preserved by Congress. Now, does that reserve mean that the other things listed in the six clauses are exclusively the business of the, and prohibited to the states? Yes. And what's your evidence for that? I mean, I think that both the text itself, when the text is sort of fully distributing the powers, which I think it is here, now, of course, another very strong piece of textual evidence for that is Article I, Section 10, Clause 3, that expressly withholds the powers from the states. And I do want to make the point that that differentiates the raise and support armies power from all the other powers that this court has considered in cases that have really gone both ways, with a few exceptions. One is the 14th Amendment. In his opinion for the court in Fitzpatrick v. Bitzer, Justice Rehnquist relied on the fact that the 14th Amendment both grants power to the federal government and expressly withholds power from the states. That was the same framework that Hamilton set up when he explained when there would be a surrender in the plan of the convention. The court in Katz in footnote 13 referred to the interaction between Federalist 32 and Federalist 81 in explaining that the bankruptcy clause falls within another one of those categories that's in Hamilton's essay, Federalist 32. So I think that is powerful support, assuming the court is going to continue to rely on Hamilton's account of sovereign immunity to understand where there was a surrender of sovereign immunity in the plan of the convention and to find that these particular powers are subject to that surrender. Justice Thomas, any questions? Yes, Chief. Perhaps not as enamored of Hamilton as some are. I'm looking, counsel, at Article I, Section 10. It also precludes states. It says no state shall enter into any treaty on and on, but it also mentions the coinage clause. So can you have the exact same or similar exercise of authority under the coinage clause as you are now suggesting exists under war powers? So, Justice Thomas, we don't have a position on that, but I agree with you that that is one of the few other powers that fits within that Hamiltonian framework, and there would be an argument that Congress could breach sovereign immunity under that power. But I would be quick to note that there's a lot of other evidence with respect to the war powers, all the tremendous evidence about the convention itself and what states recognized they were giving up at the time of the convention in the area of the military. Although I haven't fully studied it, I doubt that that's present for the coinage clause, so the argument would be somewhat weaker there. But the Hamilton point, I agree, would be the same. So does it affect your argument that this authorizes suit in state court and that it authorizes money damages in justice? There was some suggestion by Justice Breyer in his questioning that there wasn't much difference, appeared to be not much difference between just compensation and damages in these cases. So does that affect your analysis at all, one, that it's in state court, two, that it involves money damage in what is more, I think, like a tort suit as opposed to just compensation for taking property? Sure, Justice Thomas. I'll take them one at a time. I think ultimately the fact that Congress made the judgment to channel these suits into state court doesn't affect the analysis. Congress could always channel suits into state court. That's the Madisonian compromise that this court has recognized for many years. And the fact that the Congress decided to do that in this case I don't think changes the plan of the convention surrender analysis. As to your second question about damages, I agree that the damages at issue here are different than in the takings case. But they're not different than would be at issue in a Title VII case under the 14th Amendment where I think everybody agrees, including my friends from Texas, that they're suable, including in state court, for damages. In a discrimination case, it would look a lot like the suit in this case, although the basis for the discrimination obviously would be different. There's nothing foreign about the notion of damages and a waiver of state sovereign immunity. And the same is true about suits by states against other states. There are, as this court is well aware, suits by states against each other for damages in water-related actions and other actions where I think everyone agrees there is a waiver of sovereign immunity in the plan of the convention. So do you think that there is no difference between a grant of authority under the 14th Amendment and implying similar authority under war powers? Well, I think it would depend. Of course, each power comes with its own history and its own analysis. But I do think there's a lot in common between the 14th Amendment and the Raise and Support Armies power. As I said earlier, both are granted and withheld by the text of the Constitution. And I think both indicate an unusual and particularly sort of superior relationship between the federal government and the states. Obviously, the 14th Amendment was adopted as a result of war, and the understanding of the Raise and Support Armies clause was similarly a response to the Revolutionary War and the failure of the states to provide for the military and the paramount purpose of ensuring that state obstruction of the federal military would not continue under the new Constitution. Thank you. Justice Breyer, Justice Alito, Justice Sotomayor, Justice Kagan, Justice Gorsuch. I'm just wondering what the limits are of the principle you're asking us to adopt. I understand the textual commitments in the 14th Amendment, but here we're being asked to adopt a view of implicit penumbras emanating from the War Powers Act. Sorry, from the War Powers that the President and the Congress have, Article I, Article II. And you're giving us a very broad view of what those powers are, including to raise armies, going so far as to suits against the states for veterans coming home. And without any linkage to necessity of any current exigency or any need for troops today, there's no argument here, as I understand it, that this is actually necessary or that Congress couldn't and the federal government couldn't bring these suits themselves if they wanted to do so. There's no argument that allowing private suits against states is necessary to raise an army in the United States today. And so I guess I'm just wondering, what are the limits? I mean, Justice Alito posited a pretty interesting example about potholes on interstate highways. Would every state policy that could be subject to an argument that it would impair the ability of the federal government to raise an army or a navy or to conduct war be subject to suit, private suit by private individuals with punitive damages and attorney's fees? The broader you argue for the war powers of the United States, the broader the consequences are for federalism. And I just want you to have a chance to address that. Sure, a couple of things. In answering the later part of the question, I think I can address the earlier part, too. I think there is an argument in this case that allowing these lawsuits is necessary to raising and supporting armies. That's obviously the judgment that Congress and the president, the two political branches of the government, made when they enacted the statute. You're not arguing, though, that we don't have other mechanisms to raise and support armies. It's just it's the preferred one today. I get it. Conscription's not very popular, but it sure worked for about 200 years. Well, Justice Gorsuch, I don't think that's with respect how the court normally addresses Congress's exercise of its enumerated powers. For example, the court in Rumsfeld v. Fair didn't say...  My question is how broad does this go? The broader you create a war power, and you're extending it very broadly here, the greater the impact is for federalism. And at some point, they come to a head. And I'm just asking you where you think that balance lies. I mean, I think it lies, at least in this case, at the perimeter of the raise and support armies clause. I don't think that just because Congress or some litigant asserts that something is within the raise and support armies... Congress says you can sue for potholes on interstate highways, and you get punitive damages. I think this court would be very skeptical of a claim that that falls within the raise and support armies clause, but I don't think this court should... Well, Congress said so. I mean, Congress said so. So you're asking us to defer to Congress here because Congress said so. I mean, what then? If Congress did say so in a statute enacted by the representatives of the states, then we would have... I think we would probably be here defending that statute. But it would be a tougher argument than... And what happens to the Tenth Amendment in that world? What happens to federalism in that world? Well, Justice Gorsuch, I think it would... First of all, I don't think that lawsuit probably would come out in the federal government's favor, although I think in that hypothetical scenario, we would probably try to defend it. But to get to the heart of your question, I think that with respect to raising and supporting armies, the power of national survival, the federalism principles really do apply differently. I mean, that's what the court said in the Selective Draft Law cases when it said the states' militia can be drafted into service by the United States and sent overseas. That's what the court said in Case v. Bowles when it held that Washington's timber can be sold at a price dictated by the federal government even though the state constitution dictated otherwise. The court said that to read the constitution differently would be to render it a self-defeating charter. And so in this particular area where the survival of the nation is at stake, I think it's fair to say that federalism principles apply in a somewhat lesser way. Justice Kavanaugh? When you say the survival of the nation is at stake, can you explain that? Sure. Without a military, the federal government can't defend itself. That was the exact purpose that motivated the adoption of these provisions in the constitution in the first place. And you're relying on the Raise and Support Armies Clause, the text. You're not relying on penumbra, I didn't think. I'm not. I mean, I think state sovereign immunity is itself something of a penumbra. It's not stated in the text of the constitution. But, no, we're relying on the text of the Raise and Support Armies Clause. And you alluded to this, but why is it necessary today to have this kind of law or maybe looking ahead? I mean, a case like this, we should not be deciding it without thinking about 20 years from now, 40 years from now, 60 years from now. Sure. And this, I hope, follows up on Justice Gorsuch's question, too. The United States has a military of 2 million people. 800,000 are National Guard members and reservists. These are people who work for civilian employers at the same time they have jobs. They've never been more important to the military than they are right now. And one of the first questions that people like that will ask when they're considering whether to join the military is, well, do I get to keep my job? Does my employer have to let me take leave for training exercises or be deployed? And it really does matter in the real world for the Army to be able to tell them, yes, your employer does have to do that. In fact, as one of the amicus briefs in this case points out, the brochure that the Army gives to its recruits lists the USARA protections as part of the incentive package that they receive to join the military. And it would matter a great deal in the real world if it was harder for the United States to recruit Guardsmen and reservists for the military. Obviously, the national security needs are unpredictable and the government doesn't know when it's going to need to deploy troops overseas. And being able to have a supply of forces to defend the nation is one of the most existential jobs of the federal government in the first place. Thank you, Justice Barrett. Thank you, Counsel. General Stone. Thank you, Mr. Chief Justice, and may it please the court. No one disputes the importance of the war powers or the USARA advances constitutional ends. Sovereign immunity never limits the ends that Congress may pursue, only the means that Congress may use in achieving them. Neither precedent nor history show that the states authorized Congress to use the means of subjecting states to private damages actions by delegating the ends of raising an army to Congress. Torres's contrary argument rests on two premises. First, that the Constitution delegates a plenary and exclusive war power to Congress. And second, that the erection of state sovereign immunity impermissibly frustrates the exercise of those war powers. That's the argument this court embraced in Union Gas and rejected in Seminole Tribe. There, this court affirmed that even though it had described the Indian Commerce Clause as plenary and exclusive, Congress could not use that clause to expose non-consenting suits to damages actions. This court cannot agree with Torres without rejecting Seminole Tribe and the various cases relying on it. But even if this court wrote on a blank slate, Torres lacks compelling evidence of a plan of the convention waiver. He cites nothing in founding era debates that supports his incredible result, provides no examples of analogous founding era suits against states, and he points to no attempt by Congress to expose states to such damages actions for over 200 years following the founding. There is no evidence that the founding generation saw the power to expose states to private lawsuits as inextricably intertwined with warfare or that the states intended to be sued without their consent by giving Congress the power to raise an army. Without such compelling evidence, Torres cannot prevail under the plan of the convention. Now, unless the court would like to direct me otherwise, I wanted to begin by speaking directly to one of Justice Alito's concerns regarding what my friend on the other side was seeking, essentially, the sort of Torres's theory of relief. Well, maybe if you don't mind, I'd like to direct you to some of the statements you just made. Nothing in the plan of convention that is applicable here that supports the result on the other side? Yes, there was no law like ERISA with respect to the obligations that could be enforced against the state, but it does seem to me that their strongest argument is what they have in the Federalist Papers in the very reason that the convention was called. Do you disagree with that? I agree that is their strongest point, Your Honor, though obviously I disagree about whether or not that's sufficient or anywhere near required for a plan of convention waiver. In part because of a couple of precepts this Court has recognized, and I'll give you a historical example that I think explains it. For one, this Court has described sovereignty as having many aspects. So, for example, the power to enter into a treaty, to declare war, power to coin money, to pursue criminal charges against individuals. There are many aspects of sovereignty. This Court has also described states as residual sovereigns, which is to say they keep whatever they haven't given away. This is certainly the understanding of the founders in the Federalist Papers and certainly a sort of basic precept of state sovereignty to begin with. So the first and relevant question isn't whether or not states have specifically withheld an aspect of sovereignty, but what they've given away. Now, this isn't the war powers exactly, but I think perhaps the next door example is the treaty clause. Undeniable that in Article I, Section 10, the power to engage in treaties or in confederations is taken away from the states entirely. That is an important sovereign power that plays in issues of war and peace. Nonetheless, in Alden v. Maine, this Court looked at the 11th Amendment and specifically at the rejected Gallatin proposal for the 11th Amendment, which would expose states to damages actions or to private suits arising under treaties, saw that rejection and understood that to mean that states, as of the founding, retained their immunity for treaty-based actions. So to the extent that that's correct, and I don't understand anyone here calling for overruling or undermining Alden, then it must mean at a minimum that by exiling some sovereign power, such as the power to engage in treaties, the states have not necessarily exiled their sovereign prerogative not to be sued for exercises related to that power. There are two parts to that sentence, I understand the first, but perhaps not the second. But are you saying that the states did retain some war powers? Your Honor, I'm saying... That they could then rely on, as opposed to those of the federal government? I'm saying that they gave away certain parts of sovereignty, including the ability to raise armies, to declare war, etc., and that this Court should, consistent with those being vested in Congress, and to the extent that they've been taken away in Article I, Section 10, should recognize those aspects of sovereignty have been taken away. That's not an answer to the question. Well, I'm saying that... Did the states retain any war powers? At minimum, the states have retained their prerogative not to be sued, which isn't conventionally considered a war power in some sense, in part because there isn't this inextricable intertwining between the two. Well, that challenges Congress's judgment, I guess, that the law that is at issue here was essential, was the representation of the government's representative to the ability to raise armies, right? To some extent, but I don't think so, Your Honor, precisely because the removal, the fact that the states did not confer on Congress the means of exposing states to private damages actions doesn't depend on a balancing test with Congress. This Court's prior abrogation precedents and pennies and cats don't rely on a sort of balancing between Congress believes this is a very important exercise of power, a very important clause, and therefore that overrides state immunity. So we don't... Our arguments don't rely on whether or not the war powers are important or even foundational to the United States. No doubt they do, and no doubt that the Congress believes that something like USARA is in fact important to maintain an army. It just turns out this Court doesn't balance away state sovereign immunity as sort of one constitutional value amongst many. Can I ask a... Go ahead. No? A case, a question about our precedent, and maybe picking up on Justice Kagan's questions to your friends on the other side. Looking at our precedent as a whole in this area, which points arguably in some different directions, but I think one of the strong arguments on the other side I want to give you a chance to respond is, well, if you're going to allow suits against the states in bankruptcy, if you're going to allow eminent domain suits, you're going to allow suits under the Family and Medical Leave Act, you're going to allow Title VII suits against the states. It would be bizarre not to allow suits in the war powers area where the national interest is at its apex as compared to those other areas. So that, to me, is a strong argument for them, given our precedent, and I want you to be able to respond to that. Certainly, Your Honor, and I understand the intuition behind it. Of course, the war powers are big, important exercises or fundamental exercises of power. I think the reason why that feels strange is precisely because you're having the intuition that more important things should be able to abrogate or dispense with sovereign immunity as opposed to less important ones. No, I think they're all important, but they're more national. So the constitutional text itself makes very clear that these powers are given to Congress, then Article I, Section 10, which is very important, explicitly, in case there was any mistake, divest the states, and even Article II, where the commander-in-chief power, commander-in-chief of the armed forces, including of the militia, when called into service, so that Article II displaces the state control over the militia, which was, you know, talk about taking away sovereignty. So it's not just important, it's the national-state balance there. Certainly, Your Honor. I want to speak specifically to the powers you just cited and then to speak about the Indian Commerce Clause and the treaty power to sort of make the point. Regarding cats and regarding there being sort of a uniquely federal interest there, there's a uniquely federal interest. This Court described what it was recalling cats in Allen v. Cooper that sort of cited that there were these disparate state discharge orders and that ultimately individuals were being kept in debtors' prisons as a consequence. And it looked at the Bankruptcy Act of 1800 and the potential for habeas relief there and sort of concluded by that ongoing history contemporaneous with Chisholm that the states had planned for federal courts to have a unique role to solve this problem among states. So unique that, in fact, that clause itself disposed with any opportunity, any sovereign immunity defense. Of course, this Court also described that as a good-for-one clause only holding, in part because it was recognizing that this Court had held, not just stated, but held in Seminole Tribe that all other Article I Section 8 powers wouldn't yield that result. But since then, I mean, since that statement, that that's a good-for-one holding, it seems to have been proved wrong, right? Because Penn East comes along and says, no, it's not a good-for-one holding. And Penn East, I think the world after Penn East, you might think, makes Seminole Tribe look like a very different decision. I understand that intuition as well, Justice Kagan. I think part of what's doing work here is clause, a good-for-one clause only holding. The eminent domain power as identified is not a clause, of course. It is a kind of sovereign power. This Court identified in its precedents had been routinely assumed to belong to all sovereigns. This Court turned to its precedents and saw that that not only belonged to all sovereigns, it clearly belonged to the United States and could be exercised in state land. And the sort of subsidiary questions for this Court to decide were based on the district delegation. Just taking a subset of Justice Kavanaugh's question and just focusing it on the eminent domain power, I mean, in what world could it be a sensible result to say states can be sued on the basis of the eminent domain clause but not on the basis of war powers? I think it's a creature of the plan of the convention test which goes specifically granularly to whether or not the states understood that this kind of judicial process would be worked against them. Well, weren't war powers kind of the plan of the convention? I mean, what was this all about except to ensure that war powers were held by the federal government and not by any states? That was, you know, I understand that you don't want to be ranking clauses in order of importance, but I think we can say that in terms of the foundational commitments of the Constitution, that was pretty much the premier one. And no doubt that's true, Your Honor. At minimum, they're incredibly important and we can search the historical document and find as much about that. But there are other powers that are, of course, important to exercise in World War II. For example, the ability to borrow and spend money, the ability to regulate commerce. These are things that the founders had historical evidence and historical experience with. And nonetheless, this Court has previously said that these sort of commercial-sounding powers nonetheless leave the state sovereign meaning intact. So it might well be the case that if this Court wanted to say, well, powers being used towards war or towards the ends of war just have to be judged on some different model, that that would require this Court at least to sort of say, well, this isn't a plan of the convention question, at least out of the granularity that it looked to specifically in Katz and specifically in Penn East. But there's something special about the sort of important nature of the war powers that must yield a different result. Well, maybe there is. And Justice Breyer was asking your friend on the other side, asking Mr. Michel about what kinds of sovereignty may have been retained. And another way to think about the questions that Justice Kavanaugh and Justice Kagan have been asking you is, if the states gave up all of this with respect to war powers and such a crucial aspect of the convention, does it make sense to think, oh, but they retained sovereign immunity. I mean, that seems kind of like small potatoes when you think about everything else they relinquished in this area. No, Your Honor, in part because I think, as this Court's recognized describing Chisholm time and again, the founding generation jealously guarded their sovereign immunity. They didn't think that was a sort of small potatoes afterthought aspect of sovereignty. And so to talk about the plan of the convention dispensing with particular aspects of sovereignty, the treaty power, the power to declare war, et cetera, the fact that these states broadly believe they retained their sovereign immunity, I think requires some showing that specifically in a given context, the states had exposed themselves to private suits, essentially had agreed not to raise that. This Court has found that in specific historical contexts, like the bankruptcy clause and like eminent domain, it has said even though dealing with the treaty power, which is something that's sort of on a first order foreign relations issue, despite the treaty power being prohibited to the states in Article I, Section 10, nonetheless state sovereign immunity remains intact to treaty-based claims. So I don't think the sort of wholesale treatment of sovereign engross is consistent with how the Court has looked at sovereign immunity or sovereignty vis-a-vis the states. What about thwarting power? I mean, I think one of the strong arguments on the other side is one that Justice Kavanaugh was pressing Mr. Michel about, which is that this post-Vietnam states were expressing their policy disagreement with United States foreign policy and the United States engagement in the Vietnam War by discriminating against veterans upon their return home. One of the problems in Penn East was that New Jersey, by refusing to cooperate in the policy decision that the United States had made with respect to national gas pipelines was thwarting federal policy. And isn't it all the more serious here to have the states have the potential to thwart? I mean, let's imagine that states decide that, let's say, we get involved in Ukraine and states say that we shouldn't be, and so they use discrimination against veterans returning home to express their disapproval of our engagement. Your Honor, and I don't want to generalize too much without speaking specifically to your example, it's of course the case that whenever states exert their sovereign immunity against acts of Congress, it's going to frustrate them. It will sometimes frustrate them in little ways and sometimes in large ways. That's a consequence of immunity in any context. Now to your specific example, Congress has several tools remaining, the most important of which that hasn't been really adequately discussed so far, is that of course the United States is entitled to bring suit. Congress has specifically given them a cause of action against the states under USERRA to pursue remedies in federal court against aggrieved servicemen. One of the things that Penny said, the court said there that it would be counterintuitive to allow the United States to sue but not private parties. So why isn't the same true here? In part because that was discussing, I believe, the specific history of the fact that it was a robust history of delegating the power to condemn, specifically the power to exercise eminent domain. There was a robust history of that before and after the founding, and there was an agreement that the United States had the power to exercise eminent domain against state lands. So the only question left was whether or not that power as exercised and delegated by the United States sort of lost some of its character when being put into individual hands. This court determined it wasn't in part because the power of eminent domain really was the power to condemn. It was a judicial power. It was a power that had an inextricably intertwined judicial characteristic with which there is no sort of war historical analog where there's this robustly delegated power, this robustly delegated cause of action, and if it can be used and can be delegated, surely it must be the same in the context of the United States and of individuals. The United States, because it has a distinct plan of the convention waiver for its benefit when suing individual states, can always, up to and including on Mr. Torres' behalf, sue Texas and sort of pursue specifically the interests that they have. This is a point that this court made in Alden, but of course the United States will sometimes come to this court and express on behalf of the Solicitor General a belief that state sovereign immunity has to be dispensed with and yet will not have a tradition of actually pursuing these actions themselves. This is something that could be easily solved by the U.S. and also, to the extent that the DOJ doesn't want to make this a priority, Congress, through spending clause legislation or other mechanisms compliant with other spending clause restrictions, can induce the states simply to waive their immunity because Congress has absorbed them. You're telling Congress how to wage war successfully, but Congress and the President make that judgment about how to wage war successfully. You agree that the power to wage war has to be the power to wage war successfully, correct? In one sense and not the other, Your Honor. In what sense is it not the power to wage war successfully? It might be more expedient, for example, for Congress to delegate the power to make appropriations for the armed services to a single individual in the Senate, but it wouldn't be allowed to do that consistent with Article I, Section 7. And then you agree that the power to wage war successfully depends on personnel? No doubt. And personnel today is volunteer and a significant percentage are Guard and Reserve. Of course. And those people need protection from their jobs, for their jobs. Absolutely, Your Honor. And a lot of them are state employees. Yes, Your Honor, though I might point out that Texas, by my best numbers, has approximately 35,000 state employees who are veterans for the state. The United States government, from what I understand, has about 950,000. And, of course, to the extent that the United States believes that this is a vital part of defending, sort of keeping a ready military, doesn't expose itself to remotely the same kind of action. Right, but the concern underlying, as Justice Barrett was saying and I mentioned earlier, the concern underlying this is state hostility to the United States' foreign policy or national security objectives and to carry that out by hampering the war effort or preparation for war. We have to be thinking about the next 50 years. We don't know what's going to be happening over the next 50 years. We don't know what's going to be happening over the next 50 days in terms of national security and personnel. And so I think it's important to recognize that a significant component of the power to wage war successfully is having personnel who are willing to sign up, and they're not going to be willing to sign up. I mean, that's a practical argument. You can just say that's irrelevant if you want, but it's an important overlay of what's going on here. It's not in the plan of the convention is relevant today is what I'm getting at. I don't at all think that's irrelevant, Justice Kavanaugh. What I would point out, though, is that to the extent that you're drawing inferences about how core some of these remedies or actions are, you should look to the United States' actual practice, which is to say the United States over the course of the calendar year 2020 or 2020 and 2021, I believe, filed more briefs in this court urging this court to deny review than it took up cases under USERRA, which this is a very sparing occurrence for the federal government who has orders of magnitude more individuals, more veterans employed before it. And that's not to say that the original delegation by Congress isn't important, but it's a little inconsistent to describe this as sort of ultimately vital to the national war effort, but then we see it very infrequently. Also, equally hard to explain is the fact that for the federal government, who, again, orders of magnitude more than even Texas, a very large state. To the extent that there is an aggrieved serviceman, they have an administrative right of review, which can be judicially reviewed in the federal circuit on sort of APA deferential grounds. Texas, on the other hand, is treated like a private party. That's actually denominated in the statute that Texas and all those states are private parties, to which Texas is exposed to not only explicitly the full suite of equitable and sort of other powers, including expressly the contempt power, but also Texas is exposed to punitive damages as such. And it is hard to imagine a conception of state sovereignty that can be more offended by anything than a private cause of action by Congress and designed to punish a state as a state. You've given a good answer, but I want you to answer more, and I'll focus it. I'll start with the assumption, which you don't have to answer, that this has the potential of being a pretty important case for the structure of the United States of America. The war power is not copyright, and it is not the Indian Commerce Clause. It is, as Lincoln said, will this nation long endure? We hope it is never necessary, but maybe that question will come up. Okay? You see why I think it's very important. Okay, now there are three arguments that have been brought up, and I'd like to hear if you have something to add. The first is the plan of the convention. As you've read biographies of Washington and the founders, you know perfectly well that they were terribly upset at the way the states were behaving in respect to the Continental Army and thought that that was causing the United States basically to lose, almost. And they were at a convention, and if I put the matter in a comical way, because it's not meant totally comical, in the play they say George III says, they'll be back, wait and see. They'll come crawling back to me. And that was in the framers' mind, though not the music. And now we look at the text, and my goodness, six sections in Article VIII, another in Article X, another in the second, the President's part. My goodness, that suggests that was their framers' mind. If you want to say something about that, that's one. Two, is this theoretical? I lived through Vietnam. I saw what was going on. I hope we never have it again. But my goodness, the blue states might well have, although the President of the United States and the Congress thought the only way to deal with this is we get as few conscripts as possible, as many volunteers as possible, and the states, blue, would have said, no, we're going to do everything in our power to prevent you from getting those volunteers, including not giving them their jobs back. Could that have happened? Yeah. Did it happen? I'm not sure. Maybe. And we could have another.  And you say, go, bring the government, bring the lawsuit. Against how many people were there in Vietnam, in the armies? They'd be suing for the next thousand years. And the third, you look at Federalist 32, and two of the three pieces of evidence that Hamilton says, were it granted in one instance an authority to the Union, and in another prohibited the states from exercising the like authority. I can't say it's explicit, but those three parts of the Constitution I mentioned sound it. And then the second thing, the third thing, were it granted an authority to the Union to which a similar authority in the states would be absolutely and totally contradictory and repugnant. Well, that's Hamilton. And you've heard the evidence that that's what this case is. Okay? Now, I've simply summarized the three arguments you've been hearing this morning. And you've answered them pretty well. And I want to give you the chance to answer them further, if you wish. Thank you, Justice Breyer. Let me start with the first. So, as I understand the thrust of your first inquiry, pointing out that there are many, many powers vested in the Federal Constitution that touch on war, and that clearly in historical documents, those are very important, historically speaking, powers. That's no doubt the case. Unfortunately, to the extent that this Court were intending to give Mr. Torres sort of the full measure of what he's asking for, this Court has to think about its previous statements in cases like Alden and Seminole Tribe. Of course, stare decisis is a practical, sort of practical consideration or practical doctrine. But this Court has said, and as recently as Alden v. Cooper repeated, that no Article I, Section 8 power sort of dispenses with state sovereign immunity. To say that all of the powers that are reasonably described as war powers suddenly actually had no immunity to resist in the first place would be to, at best, minimize Seminole Tribe to virtually nothing. It surely occurred to this Court when it propounded that statement in Seminole Tribe and reconfirmed it in Alden, that all of the powers in Article I, Section 8, including a number of powers that had a direct basis on war, including the Army Clause, the Navy Clause, the Enclave Clause, and so on. So at minimum, to the extent this Court were inclined to say something along the lines of this critical nature, this foundational nature of these powers, means they are treated differently. It has to be prepared to disregard decades of precedent in sovereign immunity. Two, if I understood your next question correctly regarding the practical possibility of states engaged in deliberate political obstruction on ideological grounds, that strikes me as the sort of thing to the extent to which a Court is going to be effective at all, which of course we're all talking about a circumstance to which these must be problems that are presentable to a Court, where this is all sort of unnecessary because all sovereign immunity dispenses with is whether or not a Court can sue. One would think the United States would sue California or any other sort of obstreperous state, and that, in fact, they would sue in the nature of class relief or equitable relief, prohibiting California and or any of its officers from engaging in that flatly illegal policy. One would think that that either would be effective or if it weren't, but if it weren't effective, then the Court would face a constitutional crisis because the state is sort of deliberately disobeying federal court orders. So I think there's nothing left for the courts to do at that point. It would be a matter for an executive branch. I'm not quite sure that I'm perfectly following the third question regarding the extent of Hamilton's statements, except just to point out that no doubt, for example, in the Indian commerce context, that power certainly had shades of war and peace. It would be utterly unsurprising to have described to the founders that the power to govern relations with the Indian tribes would be the power, in fact, to engage in policies and to prevent battles with Indian tribes, prevent the loss of life and otherwise settle these through treaty agreements. And nonetheless, this Court has held that neither that clause nor the treaty clause can be used to expose states to private damages actions. I mean, taking things out sort of one level of generality, it's of course the case that the federal constitution provides the federal government with profound powers relating to war and peace. It's just this Court has observed many times before that sometimes those powers don't come with state sovereign immunity because that's a separate aspect of sovereignty. And so the fact that the states have indeed given up great powers related to war and peace, large aspects of their sovereignty, does not mean they've given up all of it. Otherwise, the concept of calling states residual sovereigns sort of doesn't have any further purpose. If there are no further questions, I'd see the balance of my time. Small question. Did you preserve the state law immunity argument as an adequate and independent state law ground? The federal government says you did not. You didn't really respond to that in your brief. Yes, Your Honor, we did preserve it. The quote on which the federal government and Mr. Torres rely was speaking specifically as to federal law immunity. There are a number of places in that lower court brief where the state specifically, I believe, cites Alden and describes about the distinct power that a sovereign has in its own courts as independent from a federal law immunity. So we certainly raised it for purposes of what would be considered preservation under Texas law. It was considered raised before the Texas Supreme Court also to the extent that this Court's looking about whether or not it's a way if it was raised in the briefs below. Justice Thomas, any questions? No questions, Mr. Chief Justice. Justice Breyer, Justice Alito, Justice O'Neill. Counsel, I can't take much from the lack of cases or evidence of Congress doing something until a need arises because I can't see Congress prophylactically passing rules if it doesn't see they're necessary until they become necessary. And really, the Vietnam War is what made this statute necessary because it's the first time we see a state potentially taking action that's going to directly affect the military's power. But do you discount the 1830s history where, and as did Justice Gorsuch with respect to the habeas power, and there courts were releasing federal military officers from state custody because they were needed for the war efforts at the time and the courts and the states had absolutely no hesitation in saying that congressional need superseded the state's need to hold a prisoner in custody. That was an individual suit, not for money. I grant you, but you didn't need money there because all you needed was the person to be released. So I guess what I'm asking is, you can see that the states knew that if they impeded the war effort, they would be sued by the federal government at least. I know that the first opportunity an individual had to sue in the 1830s for his own release, the courts gave him that power, the individual to sue the state in state courts. So what is the next step missing with respect to the plan of the conviction? That we need some further proof that there was a belief that there wasn't a power to sue the states for individual damages? If the federal government could, why can't the individual? Well, Your Honor, just to make sure I'm keeping myself clear, what I've conceded is that of course there's a separate plan of the convention waiver for any kind of lawsuit by the federal government against any state. So that would apply in and out of the war context regardless. Our position would be that suits in the nature of habeas corpus simply don't implicate whether or not states believe they gave up their sovereign immunity because going back to Blackstone, sovereigns had never thought themselves having the power to erect a state sovereign immunity defense in habeas, neither in English practice nor in American practice. So those habeas cases are interesting for purposes of the discussion of sort of state and federal power, perhaps supremacy issues in other contexts, but the fact that those state habeas cases were permitted tells us nothing about whether or not the states believed they could raise such a sovereign immunity defense because no state believed it had a sovereign immunity defense to a habeas action. What's missing here is some sort of exercise by Congress or historical practice that would be in an analog where pursuant to the exercise of a war power or something related to war, Congress, or in English practice, had delegated to individuals the ability to bring lawsuits against non-consenting states for something thematically related to war. So for example, an individual happened to miss their employment while they'd been conscripted or something like that. If Mr. Torres had presented that, that would be powerful evidence that there is some association between the exercise of war powers and these private damages actions and powerful evidence for a plaintiff convention waiver, and that's just not here. Justice Kagan? Oh, I'm sorry, Justice Alito? Mr. Stone, General Stone, could you comment on how far you think the argument would go if we agree with petitioners? If states could not assert sovereign immunity with respect to any claim that is supported, that is necessary and proper to raise armies, how far would that go? Much further than union gas, Your Honor. So at a minimum, you'd have virtually every power that could be associated with the exercise of war, which as a basic historical matter includes the power to tax, borrow, spend, the power to be able to raise money, the ability to restrict commerce in order to direct that individuals may be sanctioned or to mandate the production of certain materiel. Of course, it would go through virtually all of Article I, Section 8's war powers as such, which my friend on the other side summarizes, I believe, eight of those powers. And then for perhaps any other power, so long as it's being used in an ancillary sense to either wage war or to make peace. Said differently, it would require essentially the complete abrogation or the complete sort of disregard of a seminal tribe and every case from it. And it certainly would take the commentary in Penny and Katz that these are sort of narrow specific exceptions to a broad rule of sovereignty and would render those flatly inaccurate. Justice Kagan? Justice Forsage?  Justice Campbell? Justice Barrett? No. Thank you, Counsel. Justice? Rebuttal, Mr. Tutte? Thank you, Mr. Chief Justice. Just a few points. Texas opened by saying that it's a means-ends distinction, that that's what's at stake, that the powers may be great but the means can be limited. But if you go to the Federalist No. 23 by Alexander Hamilton, he addresses this directly and he says that the means ought to be proportioned to the end. These powers ought to exist without limitation because it is impossible to foresee or to define the extent and variety of national exigencies and the corresponding extent and variety of the means which may be necessary to satisfy them. There can be no limitation of that authority, which is to provide for the defense and protection of the community in any manner essential to its efficacy. That is, in any manner essential to the formation, direction, or support of the national forces. This is all in one essay of the Federalist Papers. The purpose of sovereign immunity is to protect liberty and the local autonomy of the states, their democratic accountability. But in the area of war, it is only by vesting the war powers exclusively in the federal government that liberty can be protected in the way that the Constitution intends. The Constitution did not intend to protect an abstract sovereign immunity of the states when it would cost the liberty of individual citizens. The war powers do not favor a peacetime draft over the encouragement of volunteers to put their bodies and their lives on the line in our military. I think that Justice Kagan is absolutely right that after Penn East, I think that the analysis is different. A uniquely national power where suits against the states are incidental to its exercise is exactly the kind of power that the Court has held entails a sovereign immunity waiver. This is not going to be limitless. Texas's argument is a bit puzzling because they say that there will be a flood of suits and the federal government will create all kinds of causes of action against the states, and yet on the other hand, Texas points out that no states have ever been authorized and that these suits were authorized only very late in the Republic. Because of the special solicitude the government already provides to the states because it understands their importance in the federal system. Captain Torres went to war, and when he came home he brought a piece of the war with him. And if he had been a member of the local sheriff's department or a U.S. marshal or worked for any other employer, he would have been able to sue to vindicate his rights. But because he worked for Texas, he had no cause of action. War powers do not countenance that result. It's not right. I'm asking this Court to make it right. I urge you to reverse. Thank you, Your Honor. Thank you, Counsel. The case is submitted.